FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
Southern Division

98 DEC 16 PM 4: 21

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| SARAH D. ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | CV-96-P-2155-S |
| | ) | |
| -vs.- | ) | |
| | ) | |
| JEFFERSON COUNTY | ) | ENTERED |
| | ) | |
| Defendant. | ) | DEC 1 6 1998 |

## MEMORANDUM OPINION

Before the court is the defendant's Motion for Summary Judgment, filed on January 15, 1998. Oral argument was heard on the motion at the February 6, 1998 motion docket and the motion was thereafter taken under submission. The plaintiff alleges that her employer, Cooper Green Hospital, racially discriminated against her after she filed several grievances and that she was terminated on the basis of a perceived mental disability  The defendant asserts that there are no genuine issues of material fact surrounding the plaintiff's claims of racial retaliation and of a perceived disability. For the reasons expressed below, the defendant's motion is due to be GRANTED.

Facts[1]

The plaintiff, Sarah Anderson, had been employed at Cooper Green Hospital (hereinafter "CGH")[2] as a phlebotomist for almost seven years when she was terminated on February 5, 1996.

---

[1]The facts are viewed in the light most favorable to the non-moving party.

[2]Cooper Green is an entity under the control of Jefferson County.

1

As a phlebotomist, Anderson was required to draw blood samples from patients and deliver the samples to the hospital laboratory. Although Anderson apparently received favorable job "ratings" during most of her tenure, she was involved in several incidents of alleged misconduct beginning in early 1995. The first of these incidents occurred on April 27, 1995, when Anderson was required to attend a mandatory sexual harassment seminar offered by Jefferson County. Shortly after the seminar began, Anderson filled out an evaluation form and left the seminar. The evaluation form contained various comments written by Anderson, including statements such as "Epps your day is coming," "Dr. Michael you have a daughter so does Mayfield," and others. While Anderson asserts that the comments were made merely to "express[] that others could also experience sexual harrassment," Dr. Max Michael, CEO of CGH, allegedly regarded the comments as hostile and inappropriate.[3]

On May 26, 1995, a second incident ensued when Anderson and Medical Personnel Specialist Barry Hudson spoke on the phone about Anderson's need to have a drug test done in order to complete her work-related injury claim. At some point, the conversation between Anderson and Hudson apparently became "heated," with Anderson allegedly saying that Hudson was "prejudiced" against black people and that "His [Hudson's] day was coming."

Five days later, on May 31, 1995, Anderson reportedly had another incident with her supervisor, Inell Juran, in which Anderson allegedly made derogatory comments about Juran and her family. On June 14, 1995, Anderson also had an encounter with Security Officer Larry Birkhimer in the employee parking deck. Although the facts are in dispute, Officer Kirkhimer filed a crime/incident report with the Hospital concerning the incident in the parking lot.

---

[3]Anderson filed a sexual harassment charge against a fellow employee who allegedly made inappropriate sexual advances towards her in June of 1994. She claims that she left the seminar because she became upset due to the personal harassment that she had previously experienced.

2

Dr. Michael recommended that Anderson be disciplined for the four incidents. On June 15, 1995, Dr. Michael issued a Notice of Contemplated Disciplinary Action for her violation of Personnel Board Rule 6.2(c), conduct unbecoming an employee in the public service. On June 29, 1995, Dr. Michael sent a letter to Commissioner Jeff Germany recommending that Anderson be suspended for five days and that she undergo a psychiatric evaluation to determine whether she was able to perform effectively her duties as a lab technician. After a hearing before Commissioner Germany, Anderson was suspended on June 31, 1995 and directed to undergo a psychiatric evaluation in accordance with Personnel Board Rule 3.8(g).[4]

Anderson was scheduled to undergo the mental examination three times but did not keep any of the appointments.[5] Anderson was notified that if she failed to attend the third appointment, "it will be considered insubordination." After failing to attend any of the three appointments for psychiatric evaluation, Anderson was terminated on February 5, 1996.[6] Although Anderson appealed the employment decision to the Personnel Board and had a full evidentiary hearing in which she was represented by counsel, the hearing officer recommended that the decision to terminate Anderson be upheld.

---

[4]Personnel Board Rule 3.8(g) states: "MEDICAL EVALUATIONS, medical reevaluation on any classified employee may be ordered by the Director if at any time the employee's performance of duties becomes deficient, or if his health or physical condition constitutes employment hazards to himself or endangers the safety, health and welfare of fellow employees and/or others."

[5]Anderson asserts that she was told by Mr. Herman Lumzy, Senior Personnel Analyst, that she did not have to attend the scheduled appointments. In his testimony before the Personnel Board at Anderson's appeal hearing, Lumzy denied telling Anderson that she did not have to go to her psychiatric evaluation.

[6]A recommendation by Dr. Michael was sent to Anderson by certified mail on January 1, 1996 informing her that he was recommending that her employment be terminated.

3

Anderson filed several charges of discrimination with the EEOC beginning shortly after she received her Notice of Contemplated Disciplinary Action. The filings occurred on June 21, 1995, August 10, 1995, August 31, 1995, September 29, 1995, October 11, 1995, March 18, 1996, and April 30, 1996. Anderson thereafter filed suit against Jefferson County on August 16, 1996 alleging (1) that she was treated discriminatorily and wrongfully discharged in violation of Title VII, § 1981, (2) that she was terminated on the basis of a perceived disability as prohibited under the American With Disabilities Act, and (3) that she was not told of her option to file for a leave of absence under the Family Medical Leave Act if she did not pass the psychiatric examination. The court need only address the retaliation and ADA claims, however, because the plaintiff conceded the retaliation and FMLA claims at oral argument on the summary judgment motion.

## Anaylsis

### I. Race Discrimination (Retaliation)

In order for Anderson to establish a claim for retaliation, she must show that (1) she engaged in a statutorily protected activity, (2) an adverse employment action occurred, and (3) that the adverse action was causally related to the plaintiff's protected activities. See Coutu v. Martin County Bd. of County Comm'rs, 47 F.3d 1068, 1074 (11th Cir. 1995). Once the plaintiff establishes her prima facie case of discrimination, the burden shifts to the employer to show legitimate, nondiscriminatory reasons for the adverse employment action. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981). Finally, the burden shifts back once again to the plaintiff to show that the employer's proffered reasons were merely a pretext for discrimination. See id.

In this case, the protected activity in which the plaintiff claims to have engaged includes: (1)

4

complaining of racial and sexual harassment to her supervisors, (2) testifying on behalf of a co-employee in a discrimination case, and (3) filing numerous EEOC complaints between June of 1995 and April of 1996. Although the plaintiff did indeed suffer adverse employment action when she was terminated in February of 1996, there is no evidence showing a genuine issue of material fact as to whether the termination was causally related to her proffered protected activities. Even assuming that the plaintiff can prove her prima face case of discrimination, the defendant has offered sufficient legitimate, nondiscriminatory reasons as to why the plaintiff was terminated. The plaintiff was involved in four separate work-related incidents for which she was disciplined within a three month period. Further, once discipline was imposed, the plaintiff refused to comply with the order for a mental evaluation. The plaintiff had written notice that failure to report for the psychiatric evaluation would be deemed insubordination but nevertheless chose not to attend or reschedule. The defendant has offered valid reasons for terminating the plaintiff and the plaintiff has offered no evidence that the defendant's reasons were pretextual. Because there are no genuine issues of fact regarding the plaintiff's retaliation claim, the defendant's motion for summary judgment is due to be GRANTED as to this issue.

II. Perceived Disability under the ADA

To establish a claim under the ADA, Anderson must show that (1) she has a disability (or is perceived to have a disability), (2) she is a qualified individual, and (3) she was subjected to unlawful discrimination as a result of her disability. See Gordon v. E.L. Hamm & Assoc., Inc., 100 F.3d 907, 910 (11th Cir. 1996); Patrick v. Southern Co. Services, 910 F. Supp. 566 (N.D. Ala. 1996). When the defendant asserts that the challenged employment decision was made *without regard to* an alleged disability, the burden-shifting approach of McDonnell Douglas/Burdine applies. See Wilson v.

5

Gayfers Montgomery Fair Co., 953 F. Supp. 1415 (M.D. Ala. 1996). However, when an employer maintains that the adverse employment action was made *in light of* the alleged disability, the traditional McDonnell Douglas/Burdine approach is inapplicable. Instead, the defendant must show that the plaintiff was unqualified under all circumstances to perform her job because of her disability, even with reasonable accommodations. See Mobely v. Board of Regents of the Univ. Sys.of Georgia, 924 F. Supp. 1179, 1189 (S.D. Ga. 1996).

In this case, the thrust of the plaintiff's ADA claim is that she was perceived as having a mental disability and therefore ordered to undergo a psychiatric examination in violation of the Act. Anderson asserts that although she does not have a mental disability, she was perceived as having one and was fired when she refused to submit to a psychological examination. The defendant argues that the decision to require her to seek a psychiatric evaluation grew out of concern for both Anderson's and her patients' well-being as a result of the four incidents in which she was involved within three months. The defendant further asserts that Dr. Michael, "having no predisposition about Ms. Anderson's mental health . . . simply recommended that she undergo a psychiatric examination to be sure that she was capable of performing her job in a safe and efficient manner."[7] However, the defendant must have had some perception of a possible mental deficiency in order for it to justify ordering Anderson to undergo psychiatric evaluation. It is quite difficult for the defendant to assert

---

[7] In support of its contention, the defendant cites to a provision of the ADA which states:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, *unless such examination or inquiry is shown to be job-related and consistent with business necessity.*

42 U.S.C.A. § 12112(d)(4)(A)(emphasis added).

6

convincingly that it did not have any belief whatsoever as to the plaintiff's mental health, and then at the same time, argue that it ordered the plaintiff to undergo a mental evaluation in order to ensure that she would be able to carry out her duties as a phlebotomist. Because the defendant simply cannot argue that it sent the plaintiff to take a mental examination *without regard to* an alleged disability, the defendant cannot rely on the McDonnell Douglas/Burdine burden-shifting analysis.

The defendant is not foreclosed from prevailing on this claim, however. Even assuming that the defendant perceived the plaintiff as disabled, there is no evidence that the defendant made the employment decision *in light of* the alleged disability, with or without reasonable accommodations. The defendant has shown that the plaintiff was fired after she failed to attend her mental examination appointment on three occasions. The evidence shows that the plaintiff was aware that failure to attend the scheduled appointments would result in disciplinary action but, nevertheless, refused to see the psychiatrist No reasonable jury could find that the defendant fired the plaintiff for any reason other than for failing to keep the three scheduled psychiatric appointments.

Furthermore, the court finds that the defendant had a valid business necessity in ordering the plaintiff to undergo the mental examination. Under the ADA, employers may require employees to undergo medical examinations when the examination is job-related and consistent with business necessity. See 42 U.S.C. § 12112(d)(4). As a hospital phlebotomist, Anderson's job required her to use needles to draw blood samples from patients. The defendant required Anderson to undergo the mental examination because it was crucial to ensure that she be able to safely perform the essential functions of her job. No reasonable jury could find otherwise. As a result, there are no genuine issues of material fact which preclude summary judgment as to this claim. The defendant's motion for summary judgment as to the ADA claim is due to be GRANTED.

Conclusion

The defendant's motion for summary judgment is due to be granted as to all of the plaintiff's

claims.


Date: ___Dec. 15___, 1998.


Chief Judge Sam C. Pointer, Jr.


Service List:
     Jeffrey Bennitt
     Robyn Bufford
     Charles Wagner